UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ**, <br><br> Plaintiff, <br><br> v. <br><br> **DIVERSIFIED SERVICES GROUP, INC.**, <br><br> Defendant. | Civil Action No. 12-cv-1608 (RLW) |

### MEMORANDUM OPINION

**I.    INTRODUCTION**

In this case, Plaintiff Service Employees International Union Local 32BJ (SEIU or the Union) argues that a number of its members were discharged in violation of an agreement the Union had with Defendant Diversified Services Group, Inc. (Diversified). SEIU seeks to have the merits of Diversified's actions discharging the employees heard in arbitration, which it claims is compelled by an agreement between the parties. Diversified responds that there is no such agreement, and accordingly disputes that arbitration is appropriate.

Upon careful consideration of the parties' briefs and related papers, and the arguments presented at a hearing on the cross-motions for summary judgment held on July 30, 2013, for the reasons stated herein the Court finds that Plaintiff's motion is due to be GRANTED and Defendant's motion is DENIED.

**II.   FACTUAL SUMMARY**

   **A.    Background**

As of July 2011, contractor East-West, Inc. provided the cleaning and maintenance work at the Nebraska Avenue Complex (NAC). (Dkt. No. 1, ¶ 6). East-West employed approximately twenty-three people at NAC for this purpose. (*Id.*). Those twenty-three people

1

were represented by SEIU, "a labor organization within the meaning of the National Labor Relations Act, 29 U.S.C. § 152(5) . . . ." (Dkt. No. 1, ¶¶ 2, 6). East-West was a party to a collective bargaining agreement (CBA) with the Union that covered the terms and conditions of employment for its cleaning employees at NAC; as of July 2011, the period of the agreement was October 1, 2008 to September 30, 2011. (Pl.'s 7(h) Statement (Dkt. No. 12, at 38-45), ¶ 15). The CBA stated that "the employer shall only discipline or discharge employees for just cause." (Dkt. No. 10-2, at 12 (§ 16.2)). It also provided that "all disputes, complaints or grievances in connection with the interpretation or application of the terms of this Agreement" were to be resolved through a Grievance and Arbitration Procedure. (*See id.* at 12 (Article 17 and § 17.1)).

In 2011, the General Services Administration (GSA) solicited bids for the cleaning services contract at NAC. (Pl.'s 7(h) Statement, ¶ 3; Brome Supp. Decl. (Dkt. No. 14, at 26), ¶ 2). In July 2011, Diversified, a cleaning service contractor, through its agent Marc Banks, "requested a copy of the seniority list [from SEIU] for the incumbent workers employed at that time at NAC." (*See* Dkt. No. 14, at 19). According to the Union, but denied by Diversified, "[a] seniority list aids a company in pricing the costs for an account and helps it submit a competitive bid." (*See* Pl.'s 7(h) Statement, ¶ 6). Just before 11:30 a.m. on July 27, 2011, the Union responded to Banks by e-mail, stating it would provide the list if Diversified signed a Memorandum of Understanding ("MoU"). (Pl.'s 7(h) Statement, ¶ 5). The MoU lists the following four points:

> 1. The Employer [i.e., Diversified] intends to submit bids for work in the jurisdiction of the Union, Washington DC, including all DC District and Federal Government buildings, Montgomery County Maryland, Baltimore County Maryland, and Northern Virginia sites where the cleaning and maintenance employees are currently represented by the Union.

> 2.   It is the Employer's intent, if it is awarded such work, to hire the incumbent employees and maintain their current terms and conditions of employment.
>
> 3.   In the event the Employer is the successful bidder, it agrees that it will assume the collective bargaining agreement in effect at the sites.
>
> 4.   The Union agrees not to take any action, including leafleting or other public demonstrations, opposing the Employer's bid.

(Dkt. No. 1-2, at 8). Diversified signed and returned the MoU by e-mail twelve minutes later, and then the Union sent the seniority list by e-mail just over an hour after that. (*See id.* at 10).

On September 16, 2011, the Union and East-West signed a new CBA that extended from October 1, 2011 through September 30, 2014. (*See id.* Ex. E (35-54)). This agreement includes the same language in Articles 16 and 17 as in the previous CBA. According to the Union, the new agreement increased wages "and other benefit funds." (Pl.'s 7(h) Statement, ¶ 17). The Union claims this negotiation happened "[w]hile the NAC account was out to bid." (Pl.'s 7(h) Statement, ¶ 16). Diversified disagrees, claiming that "[i]n the fall of 2011, GSA cancelled the aforementioned 2011 Solicitation. In early 2012, GSA issued a separate Solicitation, utilizing a completely different procurement approach . . . ." (Brome Decl. (Dkt. No. 10-1, at 11), ¶ 5).

Banks informed the Union in May 2012 that Diversified would be taking over the contract from East-West at NAC as of June 1, 2012. (Pl.'s 7(h) Statement, ¶ 18). On May 9, the Union sent Diversified a copy of the CBA then in effect between East-West and the Union at NAC, i.e. the CBA signed in September 2011. (Pl.'s 7(h) Statement, ¶ 19). In sending the document, the Union stated it "would like to have the same contract as East West (current employer)." (Dkt. No. 12-2, at 53). The document sent by the Union contained essentially two changes from the CBA signed in September 2011: the initial date of the agreement was changed to June 1, 2012, and East-West was replaced with Diversified. (*See* Dkt. No. 1-2, Ex.

3

D (13-34)).  On May 21, 2012, Diversified and the Union met; the contents of that discussion are in dispute.  (Pl.'s 7(h) Statement, ¶ 21; Dkt. No. 14, at 21).

The parties agree that around June 1, 2012, Diversified replaced East-West at NAC and hired the twenty-three incumbent East-West employees.  (Pl.'s 7(h) Statement, ¶ 22).  Within the first thirty days of assuming the NAC account, Diversified discharged seventeen of the twenty-three incumbent employees.  (Def.'s Statement of Material Facts (Dkt. No. 10-1, at 1-8), ¶ 30).  The Union responded to this in several ways.  On June 13, 2012, Union representative Luis Benitez "reached out to Diversified seeking to bargain."  (Pl.'s 7(h) Statement, ¶ 26).  After "confirming" that Diversified signed the MoU, later that day Benitez "corrected his initial request to bargain, and sent an e-mail to remind Banks that Diversified had assumed the 2011 CBA."  (Pl.'s 7(h) Statement, ¶ 27).  Then, beginning June 14, 2012 and continuing through July 2, 2012, the Union initiated written grievances on behalf of the discharged employees.  (Dkt. No. 1, ¶¶ 23, 26-30).  On July 10, 2012, Teodoro Rodriguez of the Union "consolidated all of the grievances into one omnibus grievance, alleging that Diversified had discharged all of these employees without just cause."  (Dkt. No. 12-3, ¶ 4). By letter dated July 26, 2012, Rodriguez notified Diversified of the Union's intent to arbitrate, and on August 1, 2012 he filed a request to arbitrate with the Federal Mediation and Conciliation Services (FMCS).  (Dkt. No. 12-3, ¶¶ 6-7).

Meanwhile, Diversified viewed the unfolding events from a very different perspective. Diversified denied it was required to assume the CBA signed in September 2011.  (Dkt. No. 1, ¶ 25).  Diversified "disagreed with the Union's interpretation of the MOU," and "declined to accept the 2011 East West CBA with Local 32BJ's unilateral changes."  (Brome Decl., ¶ 7). On July 9, 2012, Diversified submitted its own proposal for a CBA to the Union.  (*Id.* ¶ 13). The Complaint refers to a July 10, 2012 e-mail from Diversified in which the company stated it

4

had "no intention" of adopting the CBA signed in September 2011, had "no obligation" to arbitrate the discharge grievances, and refused to reinstate any employees. (Dkt. No. 1, ¶ 31). Diversified e-mailed the Union on July 26, 2012, stating that "Diversified has not entered into a collective bargaining agreement or a contractual agreement of any kind with Local 32BJ. Consequently, we will not participate in any contract-based arbitration proceeding concerning the for-cause discharge" of "at-will" employees. (Dkt. No. 1, ¶ 33). Then in an August 7, 2012 letter to the FMCS (that Diversified did not send to the Union until September 20, 2012), Diversified stated it "does *not* have an arbitration agreement or a contractual agreement of any stripe with SEIU Local 3[2]BJ at this time. In light of the absence of such an agreement, [Diversified] will not participate in the process of selecting an arbitrator or have any role in this non-contractual, extra-legal process unilaterally initiated by Local 3[2]BJ." (Dkt. No. 1-2, at 110) (emphasis in original).

With respect to the twenty-three workers previously employed by East-West, Diversified states it "informed these incumbent workers that Diversified would hire them on a thirty-day probationary basis." (Def.'s Statement of Material Facts, ¶ 26). The 2008-2011 and 2011-2014 CBAs both contain, at Section 14.1, the following language: "PROBATIONARY PERIOD. New employees shall be on probation until completion of thirty (30) calendar days of service from the date of hire. During this probationary period, such employees shall be considered as being on trial subject to immediate dismissal at ANY TIME WITHOUT RECOURSE to the grievance and Arbitration procedure." Based on this language, Diversified, without acknowledging it is bound by the 2011 CBA, argues that the employees were properly terminated for unsatisfactory job performance even under the terms of the CBA, and thus are not entitled to any arbitration procedure. (*See* Def.'s Statement of Material Facts, ¶¶ 29-33).

5

**B.     Procedural History**

The Union filed an unfair labor practice charge with the National Labor Relations Board on July 5, 2012. (Dkt. No. 14, at n.3). Diversified opposed the charge on July 30, and on August 7 the Union voluntarily withdrew the charge. (*Id.*). On August 18, 2012, according to Diversified, the Union "orchestrated the filing of a lawsuit in the Superior Court of the District of Columbia on behalf of fourteen of the 17 discharged probationary employees under the District of Columbia Displaced Workers Protection Act. On or about December 4 [Diversified] filed a Motion to Dismiss or, in the alternative, Motion for Summary Judgment in the Superior Court proceeding." (*Id.*).

The Union initiated this action against Diversified on September 27, 2012. The Complaint "is brought pursuant to the Federal Arbitration Act, 9 U.S.C. § 4 and Section 301(a) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a)."[1] In its Complaint, the Union requests that the Court compel Diversified to submit to arbitration regarding the termination of employees, and order Diversified "to honor its obligations under the CBA and cease breaching the parties' MOU." (*See* Dkt. No. 1, at 11).

Diversified filed a Motion to Dismiss, or, in the Alternative, a Motion for Summary Judgment. (Dkt. No. 10-3). In its Motion, Diversified argues that the complaint should be dismissed because a contractual agreement did not exist between Diversified and the Union since (1) the MoU did not contain a duration period (Dkt. No. 10-3, at 8-10), and (2) there was no meeting of the minds regarding the applicability of the MoU to a particular CBA (*id.* at 10-12). Diversified argues that, "[a]lternatively, in the absence of an explicit term of duration, the

---

[1]     29 U.S.C. § 185(a) reads: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

MOU would conceptually have to have been limited to the time period or periods referenced therein." (Def.'s Statement of Material Facts, ¶ 16). Therefore, according to Diversified, the language in the MoU that Diversified would accept the "current terms and conditions of employment" means it adopted only the CBA in place when the MoU was signed, and never agreed to adopt the subsequent CBA negotiated between the Union and East-West. Furthermore, without admitting the 2011 CBA applies to the company, Diversified asserts that a reasonable interpretation of the 2011 CBA permits Diversified to identify the incumbent employees as probationary from their date of hire by Diversified and, therefore, permits discharge without access to recourse. (Dkt. No. 14, at 14).

The Union filed an Opposition to Defendant's Motion for Summary Judgment and a Motion for Summary Judgment on December 11, 2012. The Union argues that (1) the MoU is an enforceable contract because there was mutual assent to be bound, an express duration clause is not required for an agreement to be binding, and regardless the MoU contains an implied durational term; (2) the terms of the MoU are unambiguous and bind Diversified to the 2011 CBA; and (3) the broad arbitration clause in the 2011 CBA requires an arbitrator to decide the status of the employees regarding their discharge.

The parties appeared for oral argument on the cross-motions for summary judgment on July 30, 2013.

## III. LEGAL STANDARDS

### A. Motion To Dismiss

Diversified has moved to dismiss the Union's Complaint under Rule 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating a

Rule 12(b)(6) motion, the court construes the complaint liberally in the plaintiff's favor and grants them all reasonable inferences. *See Stokes v. Cross*, 327 F.3d 1210, 1215 (D.C. Cir. 2003). Despite the positive inferences granted in considering a motion to dismiss, a complaint must sufficiently "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal citations omitted). Although the complaint does not require detailed factual allegations, it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.*

### B. Motion For Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). A genuine issue of material fact exists if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). While the Court views all facts in the light most favorable to the nonmoving party in reaching that determination, *Keyes v. District of Columbia*, 372 F.3d 434, 436 (D.C. Cir. 2004), the nonmoving party must nevertheless provide more than "a scintilla of evidence" in support of its position, *Anderson*, 477 U.S. at 252. To establish a genuine issue of material fact, the nonmoving party must demonstrate—through affidavits or other competent evidence, FED. R. CIV. P. 56(c)(1)—that the quantum of evidence is such that a "jury could reasonably find for the [nonmoving party]," *Anderson*, 477 U.S. at 252.

### C. Contract Principles

"In this circuit, the interpretation of contracts is considered an issue of law, not fact, and thus cannot preclude summary judgment." *Cook v. Babbitt*, 819 F. Supp. 1, 15 (D.D.C.

1993) (citing *Pa. Ave. Dev. Corp. v. One Parcel of Land*, 670 F.2d 289, 292 (D.C. Cir. 1981)). "In the District of Columbia, an enforceable contract exists when there is an agreement about all material terms and an intention of the parties to be bound." *United States v. Mahoney*, 247 F.3d 279, 285 (D.C. Cir. 2001) (citation omitted). "There must thus be an honest and fair 'meeting of the minds' as to all issues in a contract." *Simon v. Circle Assocs., Inc.*, 753 A.2d 1006, 1012 (D.C. 2000) (citation omitted). "[T]he party asserting the existence of a contract has the burden of proof on that issue." *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995) (citation omitted).

Mutual assent can be found when two parties sign a contract regardless of the parties' subjective intent. 17A Am. Jur. 2d *Contracts* §31. The question is "whether a reasonable person would, based upon the objective manifestations of assent and all the surrounding circumstances, conclude that the parties intended to be bound to the contract." *Id.* Parties may be bound to an agreement if their conduct gives the unintended appearance of mutual assent; a party can manifest assent to an offer in writing without reading it and still be bound to the terms therein. RESTATEMENT (SECOND) OF CONTRACTS § 23 cmt. b (1981). Without a manifestation of mutual assent, however, there can be no agreement and, therefore, no contract. Provided there is no fraud, duress, undue influence, or mistake, a party is typically bound to any agreement for which there is assent. 17A C.J.S. *Contracts* § 168.

Duration is "usually" considered a material term, but the District of Columbia Court of Appeals has not mandated that duration "must be in a contract for it to be enforceable." *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 103 (D.D.C. 2004) (citing *Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 370 (D.C. 1990)). When an essential term is omitted from a contractual agreement, the court can supply a term that is reasonable given the circumstances.

RESTATEMENT (SECOND) OF CONTRACTS § 204 (1981). *See also Independence Mgmt. Co. v. Anderson & Summers, LLC*, 874 A.2d 862, 869 (D.C. 2005) (citing the Restatement).

## IV. ANALYSIS

The Union asserts that Diversified, by signing the MoU on July 27, 2011, is bound to comply with the terms of the 2011 CBA that was in effect when Diversified assumed responsibility for the cleaning services at NAC. Diversified contends that the MoU is not an enforceable agreement and, even if the MoU is binding, Diversified's execution of the MoU only bound it to the 2008 CBA, which was the collective bargaining agreement in effect at the time the MoU was executed. Three issues regarding whether a contract was formed will be addressed first.

### A. The MoU is an enforceable contract because it is a product of mutual assent between the parties

Diversified argues that the parties never reached an enforceable agreement because they disagree about the meaning of the language in the MoU, language that merits repeating here. Paragraph two of the MoU states that if Diversified is awarded work in the relevant jurisdictions, it intends "to hire the incumbent employees and maintain their current terms and conditions of employment." Paragraph three reads: "In the event the Employer is the successful bidder, it agrees that it will assume the collective bargaining agreement in effect at the sites." The Union believes that this language requires Diversified to accept the CBA signed in September 2011, while Diversified believes that this language means that the company was only required to accept the CBA in effect at the time it signed the MoU. According to Diversified, "the parties' divergent positions concerning the MOU's purported applicability further reveals the lack of the requisite meeting of the minds to form an enforceable agreement." (Dkt. No. 10-3, at 10). For this proposition, Diversified cites several

cases, such as *Estate of Taylor v. Lilienfield*, which states that there is no contract if there is "mistake or mutual misunderstanding." (Dkt. No. 10-3, at 11 (citing 744 A.2d 1032, 1035 (D.C. 2000)).

But "a party cannot show lack of mutual assent merely by pointing to areas of disagreement over previously adopted language." *Eastern Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 861 F.2d 1546, 1551 (11th Cir. 1988). "In the absence of fraud or its equivalent, one is obligated by his contract, though signed without knowledge of its terms. It is not enough to avoid a contract that one party who signed it believed it did not contain what was plainly expressed therein." *Hart v. Vermont Inv. Ltd. P'ship*, 667 A.2d 578, 582 (D.C. 1995) (citations and quotation marks omitted). There are no allegations of fraud or similar defects with the MoU here, and Diversified's allegations of a lack of mutual assent are not persuasive.

Diversified itself notes that alleged contractual ambiguity "may"—not definitively does—indicate a lack of a meeting of the minds. (*See* Dkt. No. 14, at 6). Diversified argues that the MoU they signed cannot bind them to a CBA that did not yet exist, and thus there was no meeting of the minds. But this argument is contradicted by several cases cited by the Union that Diversified fails to rebut. For example, in *UMWA 1974 Pension v. Pittston Co.*, 984 F.2d 469, 474 (D.C. Cir. 1993), the D.C. Circuit found an agreement to assume an obligation under a future contract enforceable. "The District Court, relying on the words of the agreements and the extrinsic evidence properly before it, concluded that the only reasonable interpretation of the evergreen clause is one premised on a principle of 'perpetual obligation.' . . . [W]e agree with the conclusion reached by the District Court." *Id.* at 473. In *Robbins v. Lynch*, 836 F.2d 330, 331-32 (7th Cir. 1988), the Seventh Circuit found an employer bound by "any agreement [later] concluded by multiemployer and multiunion bargaining associations." These cases and others cited by the Union stand for the proposition that several courts, including the D.C.

Circuit, have found employers bound to future agreements. Thus Diversified's suggestion that no meeting of the minds could occur regarding a CBA not yet finalized is rejected. The plain language of the agreement indicates that Diversified agreed that a future event would trigger its assent to the CBA. The company took the risk that in the future a new CBA would be in effect.

Also as part of their argument for a lack of mutual assent regarding the MoU, Diversified claims that the parties have "diametrically opposed interpretations of the operative term 'current.'" (Dkt. No. 14, at 6). But this is not accurate. Both parties have the same interpretation of the term current. The difference is that the Union gives the word meaning with regard to the context in which it is used, modified by what happens only "if" an employer is awarded a contract. There is no dispute about what the word current means, and thus Diversified's production of dictionary definitions of the word are but a distraction.

### B. The MoU's language is not ambiguous

Although Diversified alleges ambiguity in the MoU, the Court finds that the language is clear. First, Diversified argues that, because it submitted its successful bid on a second GSA solicitation rather than the one it obtained the seniority list for, the MoU only applies to the first bid. (*See* Dkt. No. 14, at 21). But given that the MoU refers to "bids" in paragraph one, not a single "bid," this argument fails to persuade.

Next, Diversified argues that the use of "current" in paragraph two of the MoU refers to the CBA at the time the MoU was signed, "not the then nonexistent 2011 CBA." (Dkt. No. 10-3, at 11) (emphasis removed). But the company all but ignores that the term "current" in paragraph two is modified by "if it is awarded such work," and thus "current" refers to the CBA in effect when the work is awarded. Diversified never acknowledges the "if it is awarded such work" language in paragraph two of the MoU. The phrase does not appear in the

company's motion or opposition.  Nonetheless, Diversified claims that the Union "does not and cannot explain how the 'current terms and conditions of employment' would ever encompass" a CBA negotiated after the signing of an MoU.  (Dkt. No. 14, at 8).  Diversified calls the Union's position "an unworkable and illogical interpretation of the MOU."  (Dkt. No. 10-3, at 11).  It is no such thing.  It can work simply as follows:  an employer assumes the current CBA, or if no CBA is in place then it assumes whatever current terms and conditions are in place, at the time it is awarded a contract.

Not only does paragraph two indicate that an employer would assume the current conditions at the time it is awarded a contract, paragraph three of the MoU indicates this as well.  Paragraph three states that an employer would assume the CBA "in effect at the sites . . . [i]n the event" of a successful bid.  For Diversified's reading of this language to make sense, paragraph three would need to state that, if an employer was the successful bidder, they would need to assume the CBA in effect at the time the MoU was signed.  But it says no such thing.  Moreover, as with the "if it is awarded such work" language in paragraph two of the MoU, again Diversified never mentions paragraph three of the MoU, which further clarifies, when read in context, that the CBA in effect at the time of an employer's successful bid is the operative one.

     **C.**    **The MoU would be voidable, not void, if it lacked a durational term**

Assuming without deciding that Diversified is correct and there is no durational term, the parties disagree on the import of such a finding.  According to Diversified, "[i]n light of the absence of a period of duration, the MOU lacks an 'essential term' and cannot constitute an enforceable contractual agreement."  (Dkt. No. 10-3, at 9-10).  According to the Union, "labor agreements that lack express duration clauses are not void, but are merely terminable upon proper notice."  (Dkt. No. 12, at 19).

Case law supports the Union's position that a labor agreement lacking an explicit duration term is not void, but merely voidable upon reasonable notice. *See, e.g.*, *Boeing Airplane Co. v. NLRB*, 174 F.2d 988, 991 (D.C. Cir. 1949) ("We agree with the principle of law that a contract of indeterminate duration may become terminable by unilateral action on the part of either party after a reasonable lapse of time."); *E. Dist. Council of the United Bhd. of Carpenters v. Blake Constr. Co.*, 457 F. Supp. 825, 830 (E.D. Va. 1978) ("The agreement contains no provision regarding termination, or even the duration of the contract. Such a contract is presumed to be terminable at will according to principles of labor law, and traditional contract law, upon reasonable notice to the other party of intent to terminate.") (citations omitted). Diversified does not respond directly to any of the cases cited by the Union on this point, and in its briefing papers Diversified "provided zero case law that establishes that a labor agreement that lacks a duration clause is void." (*See* Dkt. No. 17, at 7). Given the weight of authority, this is not surprising. "[A] labor contract of indefinite duration or one that does not specify a time or manner of termination is terminable at the will of either party upon reasonable notice to the other party." *United Autoworkers v. Randall Div. of Textron, Inc.*, 5 F.3d 224, 229 (7th Cir. 1993).[2]

According to Diversified, the Union argues that Section 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d), "cures the unassailable fact [that] the MOU lacks a durational provision," and the company criticizes this supposed argument for "blithely

---

[2]   At oral argument, Diversified stated it discovered that day the case *NLRB v. Downs-Clark, Inc.*, 479 F.2d 546 (5th Cir. 1973), calling it "directly on point." But it is no such thing. In *Downs-Clark*, the NLRB tried to force the company to execute a contract with a union after claiming the two parties had reached an agreement. The Fifth Circuit found "that the Board's decision is not supported by substantial evidence. Rather, the record clearly shows that there was no meeting of the minds on the key issues of wages and merit increases." *Id.* at 548. Nowhere does the opinion state that a labor agreement without a duration clause is void rather than voidable.

ignor[ing] the salient fact that the MOU does not constitute a collective bargaining agreement." (Dkt. No. 14, at 2) (emphasis removed).  Diversified then claims that "even assuming *arguendo* that the MOU constituted a collective bargaining agreement under the NLRA and that Section 8(d) applies to the MOU, this Court would consequently lack jurisdiction to determine whether the defendant's rejection of the MOU complied with Section 8(d)" because the NLRB "has exclusive jurisdiction to ascertain whether Diversified contravened Section 8(d) and to remedy violations thereof." (Dkt. No. 14, at 4) (citing *Waggoner v. Dallaire*, 767 F.2d 589, 592 (9th Cir. 1985) and *NLRB v. Local 554*, 991 F.2d 1302, 1306 (7th Cir. 1993)).

But the Union is not arguing that Section 8(d) "cures" anything, and does "not seek a bargaining order or otherwise allege a violation of § 8(a)(5) of the NLRA." (Dkt. No. 17, at n.2).  At issue here is a contract between a union and an employer, which is governed by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185.  Therefore Diversified's argument that this Court is without jurisdiction because of the reference to Section 8(d) does not persuade.  *See Retail Clerks Int'l Assn., Local Unions Nos. 128 and 633 v. Lion Dry Goods, Inc.*, 369 U.S. 17, 28 (1962) ("We need not decide whether or not this strike settlement agreement is a 'collective bargaining agreement' to hold, as we do, that it is a 'contract' for purposes of § 301(a).")  The Union cites to Section 8(d) to illustrate a method for determining the appropriate notice period, and notes that even if the MoU is not a collective bargaining agreement, a labor contract of indefinite duration is terminable at will upon reasonable notice. (*See* Dkt. No. 17, at 6).  The point is that since Diversified failed to provide reasonable notice of its intent to terminate the MoU, the company is precluded from evading its obligations thereunder.

**D.     The discharged employees' grievances should be sent to arbitration.**

Having determined that the MoU is a binding contract, the Court now addresses the issue of arbitration.  An agreement with language such as that found here, which states that all disputes regarding the CBA will use the Grievance and Arbitration Procedure, "should be submitted to arbitration."  *See Sheet Metal Workers Int'l Ass'n v. United Transport Union*, 767 F. Supp. 2d 161, 173 (D.D.C. 2011) (citation omitted).  The Court's role is to determine whether the Union has a plausible argument that the grievances are arbitrable.  *See Wash. Mailers Union No. 29 v. Wash. Post Co.*, 233 F.3d 587, 589 (D.C. Cir. 2000).  Again, the CBA here states that "all disputes, complaints or grievances in connection with the interpretation or application of the terms of this Agreement" were to be resolved through a Grievance and Arbitration Procedure.  (*See* Dkt. No. 10-2, at 12 (Article 17 and § 17.1)).  "[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claim."  *AT&T Technologies, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).  The Union has met its burden of demonstrating a plausible argument of arbitrability in the CBA.

Of course, Diversified claims it was not bound by any CBA when it terminated employees within 30 days of taking over the NAC contract.  Alternatively, Diversified interprets Section 14.1 of the CBA to mean that the terminated employees were "new" with respect to their employment with Diversified, and thus, even under the CBA, they were probationary employees who have no recourse to arbitration.[3]  This is so, according to Diversified, because the language in Section 14.1 of the CBA "refers singularly and succinctly

---

[3]     Section 14.1 states: "PROBATIONARY PERIOD.  New employees shall be on probation until completion of thirty (30) calendar days of service from the date of hire.  During this probationary period, such employees shall be considered as being on trial subject to immediate dismissal at ANY TIME WITHOUT RECOURSE to the grievance and Arbitration procedure."

to the date of hire by 'the Employer,' in this case [Diversified]." (Dkt. No. 10-3, at 13).[4] The company contrasts this with Section 10.4 of the CBA, which refers to an "original date of hire." If there is any ambiguity in Section 14.l, Diversified argues that because "ambiguous provisions are construed against the drafter of the contract," *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1486 (D.C. Cir. 1997), "the meaning of this provision would have to be construed against the draftsman, i.e., Local 32BJ" (Dkt. No. 10-3, at 14). But Section 14.1 does not refer to "date of hire by 'the Employer,'" it only refers to "the date of hire."

The Union argues that "[i]f the probationary clause means that, once Diversified has hired the employees, it can then discharge them for any reason within thirty days, then Diversified's agreement to retain the incumbent employees would be meaningless." (Dkt. No. 17, at 19-20). Diversified argues that Section 14.1 clearly establishes they acted appropriately. This debate is not for this Court to resolve. "[W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT&T Technologies, Inc.*, 475 U.S. at 650 (citation omitted). The Court finds that the CBA is susceptible of the interpretation proffered by the Union, and that settles the matter.

## V.     CONCLUSION

The Memorandum of Understanding signed by both parties required Diversified to accept the collective bargaining agreement in effect at NAC when it obtained the contract from

---

[4] Diversified repeats this claim, that "it remains unrebutted that Section 14.1 refers singularly and succinctly to the date of hire by 'the Employer,'" in its Opposition/Reply. (Dkt. No. 14, at 16).

GSA.  Because Diversified did not do so, and because that CBA contains a requirement that disputes thereunder will proceed to arbitration, this Court finds that Plaintiff's motion for summary judgment (Dkt. No. 12) is **GRANTED** and Defendant's motion to dismiss or, in the alternative, motion for summary judgment (Dkt. No. 10) is **DENIED**.  An Order accompanies this Memorandum.


Date:  August 1, 2013

                                              ROBERT L. WILKINS
                                              United States District Judge